# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1736V

|  |  |
|---|---|
| SUSAN DAVIS,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br><br>Filed: February 4, 2026 |

*Sean Frank Greenwood, Greenwood Law Firm, Houston, TX, for Petitioner.*

*Camille Jordan Webster, U.S. Department of Justice, Washington, DC, for Respondent.*

## <u>RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES</u>[1]

On October 5, 2023, Susan Davis filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") following her receipt of an influenza ("flu") vaccine on October 12, 2020. Petition (ECF No. 1) at 1.[3] The case was assigned to the Office of Special Masters' Special Processing Unit ("the SPU").

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Petitioner's First Amended Petition filed on Mar. 28, 2025 (ECF No. 34) does not appear to alter her core allegation of a SIRVA, only adding additional factual allegations based on later-filed medical records. *See id.* at ¶¶ 8, 34.

The parties have since briefed the claim. I hereby find under the Act's more-likely-than-not standard that the vaccination was in Petitioner's left arm as alleged; that she developed new left shoulder pain within 48 hours post-vaccination; that her compensable pain and reduced range of motion were limited to the left shoulder; and that there are not other conditions or abnormalities present that would explain her symptoms. Petitioner has established a Table SIRVA, and I award $55,000.00 in actual pain and suffering.

## I.    Procedural History

In December 2023, the case was assigned to the SPU (an adjudicatory system for expedited resolution of certain Vaccine Act claims). ECF No. 8. Respondent set forth his formal opposition to compensation. Rule 4(c) Report filed May 14, 2024 (ECF No. 14). I then offered preliminary assessment of both parties' positions based on the existing record. Scheduling Order filed Aug. 21, 2024 (ECF No. 17). The parties explored the potential for informal resolution (as I had suggested), but they eventually reported an impasse. Petitioner's Status Report filed Apr. 11, 2025 (ECF No. 37). Petitioner also filed her additional exhibits 10-20 (ECF Nos. 18-19, 21, 28-33, 39-40). The parties have now briefed entitlement and damages. Petitioner's Brief, Appendix A (hereinafter "Entitlement Brief") filed June 10, 2025 (ECF No. 41-1) and Appendix B (ECF No. 41-2) (hereinafter "Damages Brief"); Response filed Aug. 15, 2025 (ECF No. 43); Reply filed Sept. 3, 2025 (ECF No. 44). The matter is ripe for adjudication.

## II.    Evidence[4]

### A. Medical Records

Ms. Davis was born in 1952, and she had no history of shoulder injury. Response at 1-2; *see also generally* Ex. 2. She is right-handed. Ex. 6 at 260; Ex. 3 at 10; Ex. 17 at 70. She received at least two prior vaccines in her non-dominant left arm. Ex. 2 at 15; Ex. 6 at 174.

On October 12, 2020, Petitioner went to her established primary care practice for to receive a flu vaccine. Ex. 2 at 10. Within an electronic medical record, a medical assistant ("MA") recorded her own administration of the vaccine and other details including: "Site: right arm. Route: intramuscular." *Id.*

---

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

Six months and a day later, on April 13, 2021, Petitioner had a primary care annual evaluation. Ex. 2 at 4. The primary care physician ("PCP") recorded:

> [Petitioner] presents with pain in left arm. [Petitioner] reports experiencing left deltoid pain after influenza vaccine last season. This took several weeks to gradually improve. She then reports falling during the recent freeze and landing on the left hip and left shoulder. Since that time, she has had pain in the left arm. This is worse with certain movements and associated with reduced range of motion in the left shoulder.

Ex. 2 at 4. A physical examination found that the left shoulder had "reduced" range of motion ("ROM") and tenderness. *Id.* at 6. The PCP did not opine on the injury's cause, and explained that "there is not enough information to establish a definitive diagnosis". *Id.* X-rays found no acute fracture, subluxation, osseous lesions, but "mild changes of osteoarthritis in the left shoulder" and "mild degenerative changes in the left glenohumeral joint." Ex. 2 at 44-45. On May 2, 2021, the PCP ordered an MRI to further evaluate Petitioner's "chronic left shoulder pain." Ex. 2 at 3. No MRI occurred, however.

Four months later, on September 2, 2021, Petitioner consulted with a neurologist, who recorded the following history:

> 10/2020 [Petitioner] received flu vaccine in left deltoid. Felt a lot of soreness/ pain immediately afterwards. Upon awakening the next day, noticed swelling. On the third day, was unable to move the arm due to increased pain. Range of motion has slowly improved but pain continues, [Petitioner] has been treating pain with ibuprofen. Also reports falling on ice during ice storm 2/2021 onto left shoulder and left hip, currently reports tightness and pulling pain in distal left deltoid, worse with abduction, also has shocking pain at location of previous vaccine site. She previously had pain radiating to left forearm and hand, but not recently, noticed left hand weakness, saw PCP and MRI [of] shoulder was ordered but insurance denied.

Ex. 7 at 26. All neurological exam findings were normal, but the left shoulder was painful on palpation and movement. *Id.* at 26 – 27. The neurologist opined that "[Petitioner] had a complication from the flu vaccine, appears that the injection was too low and probably affected the deltoid tendon. She has residual tendonitis, which affects her ability to abduct the shoulder." *Id.* at 27. The neurologist instructed Petitioner to continue taking NSAIDs; start outpatient physical therapy ("PT"); and follow up with him in three months. *Id.*

The September 20, 2021, PT initial evaluation record provides:

> [Petitioner] describes her current condition as a frozen shoulder following deltoid tendinitis from a flu vaccination in 10/2020. Symptoms started as a dull ache, worse with shoulder abduction, and has progressed to pain through the L upper arm. Initially [Petitioner] unable to wash under arm, unable to lift arm, and unable to use fingers in L arm. Pt describes pain as a throbbing pain that increases with movement. Insurance denied MRI. Mobility has progressively increased through [Petitioner] actively assisting L arm through daily activities. [Petitioner] takes half an ibuprofen, as needed, before bed.

Ex. 3 at 10. Petitioner reported that her pain was currently 4/10, but ranged from 1-8/10. An exam found left shoulder range of motion ("ROM") deficits, weakness, and pain. *Id.* at 11. After a total of 17 formal PT sessions, Petitioner's shoulder injury was improved but not fully cured. She still had a disability score of 34%; some difficulty with daily activities; pain ranging from 0-4/10; and some ongoing deficits in ROM and strength. *Id.* at 85-87. Based on a good prognosis and good understanding of her home exercise program, Petitioner was discharged from formal PT on November 18, 2021. *Id.* at 87.

At a December 2, 2021 neurology follow-up, Petitioner reported that PT had helped with her ROM and pain, but she still had pain with abduction. Ex. 7 at 22. The neurologist maintained his assessment of tendonitis, to be managed with ibuprofen. *Id.* at 23.

In June 2022, Petitioner reported that her left shoulder was improved further, but still painful. Ex. 7 at 18. The neurologist prescribed Voltaren (diclofenac sodium, an NSAID) to apply to the shoulder. *Id.* at 19. Petitioner also reported decreased fine motor strength in her left hand, but the record does not reflect any corresponding exam findings, assessment, or treatment. *Id.* at 18-19.

In December 2022, Petitioner reported that her left shoulder was still painful and not helped by Voltaren; she was taking ½ tab of ibuprofen at a time (after previously reporting concerns for kidney damage). Ex. 7 at 14. The neurologist prescribed celecoxib (an NSAID) for the shoulder pain. *Id.* at 15.

In May 2023, Petitioner reported discontinuing celecoxib after just three doses due to adverse side effects. Ex. 7 ay 10. Her left shoulder pain was improved, but she still had weakness and difficulty reaching behind her head. *Id.* The neurologist told Petitioner to stop using both Voltaren and celecoxib, and follow up as needed. *Id.* at 10-11.[5]

---

[5] The May 11, 2023 neurology record reads: "Follow Up: prn." Ex. 7 at 11. "PRN" is an abbreviation for *pro re nata*, which is defined as "according to circumstances." Dorland's Medical Dictionary Online, *P.R.N.*,

Over 16 months later, at a September 30, 2024 orthopedics initial appointment, Petitioner reported a left shoulder injury with "symptoms beg[inning] right after a flu vaccine Oct. 2020." Ex. 17 at 70. She specifically endorsed "pain, weakness, mechanical catching/locking grinding, and numbness/tingling in the hand." *Id.* The pain currently rated 2/10; was worse with activity and lifting; and was alleviated by heat, rest, and over-the-counter NSAIDs. *Id.* A physical examination of the left shoulder found tenderness at the acromion and biceps tendon; positive Hawkins, cross-arm, and impingement signs; but normal ROM, strength, and sensation. *Id.* at 72. That day, x-rays of the shoulder found "normal" joints and "no significant degenerative change." *Id.* at 8, 73. The orthopedist also noted there was no MRI of the shoulder available; a recent MRI of the humerus did not demonstrate any obvious structural findings;[6] and a recent EMG on file showed "compressive neuropathy around the elbow" which had never been treated. *Id.* at 73. The orthopedist diagnosed Petitioner with 1) left shoulder rotator cuff tendinitis and impingement, which he treated that day with a steroid injection into the subacromial bursa; and 2) left cubital tunnel syndrome,[7] which complaint he referred to a different treater. *Id.* No further records have been filed.

## B. Later Testimony[8]

Petitioner recalls that the at-issue flu vaccine was administered in her left arm. Ex. 1 at ¶ 3. Immediately afterwards, she felt intense pain and complained to the medical assistant who seemed very distraught. *Id.* Due to Petitioner's left shoulder pain, she had to drive home from the appointment with only her right arm. *Id.* at ¶ 4. Over "the months following [her] vaccination," her pain persisted, disrupted her life, and was a subject of complaint to various family members she saw or spoke with. *Id.* at ¶ 6.

---

https://www.dorlandsonline.com/dorland/definition?id=40973&searchterm=p.r.n. (last accessed Jan. 30, 2026).

[6] Petitioner's primary care physician ordered the MRI of the humerus. Ex. 10 at 7. It was obtained on July 30, 2024, and the findings were unremarkable. *Id.* at 2. Petitioner paid for the MRI out of pocket. *Id.* at 3, 31.

[7] Cubital tunnel syndrome is defined as "a type of entrapment neuropathy with a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, including pain and numbness along the ulnar aspect of the hand and forearm and weakness of the hand." Dorland's, *Cubital Tunnel Syndrome*, https://www.dorlandsonline.com/dorland/definition?id=110481&searchterm=cubital+tunnel+syndrome (last accessed Feb. 2, 2026).

[8] These statements are not notarized, but they are declared to be true and correct, under penalty of perjury. *See* 28 U.S.C.A. § 1746 (providing that such a statement may be given like force and effect as an affidavit).

Petitioner also recalls that she later slipped and fell on ice outside her home: "I had to try and fall onto my side because my left arm didn't have the strength to help catch my fall if I fell face down. While the fall made my left arm sore, the stabbing pain from the shot was the same before and after the fall. The fall did not create any fractures or injuries that would make 'new' stabbing or chronic pains." Ex. 1 at ¶ 6.

Petitioner states that she initially attempted to manage her left shoulder pain with conservative measures. Ex. 1 at ¶ 6. She also describes barriers to accessing medical care – including her primary care practice having phone issues, preferring telehealth encounters because of the COVID-19 Pandemic, and not offering an in-person appointment much sooner than Petitioner's annual wellness visit already scheduled for April 2021. Ex. 20 at ¶¶ 4, 6. Petitioner also notes insurance difficulties, including the refusal to cover an MRI in 2021. *Id.* at ¶¶ 5, 7.

I have also fully reviewed the statements of Petitioner's neighbor and four family members, who attest to her experiencing a left shoulder injury beginning shortly after her October 2020. *See generally* Exs. 12-16 (discussed further below within Section III-C, specifically analyzing the injury onset).

## III.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[9] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

[9] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

## B. Situs

Respondent emphasizes that the most contemporaneous notation – within the PCP's computerized medical records – suggests that the vaccine was administered in Petitioner's non-injured right arm. Response at 10. Petitioner thereafter did not report a left-sided administration until slightly more than six months later. *Id.* Respondent further contends that Petitioner "has not persuasively demonstrated that [this] record is more likely than not an error" - and that to do so, Petitioner would need a supporting statement from the vaccine administrator. *Id.* at 10-11, citing *Mezzacapo v. Sec'y of Health Servs.*, No. 18-1977, 2021 WL 1940435, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 2021).

The Act, however, contains no such evidentiary requirement, nor does it otherwise set forth in black and white the precise evidence required to corroborate administration situs. Rather, resolving such issues depends on the mix of evidence before the special master. In addition (based particularly upon my experience resolving SPU cases - over 2,000 in the past years), it is not unusual for the information regarding situs of vaccination as set forth in computerized systems to be incorrect. Many of these systems use a 'dropdown' menu which may not be updated each time a separate vaccine is administered to a different individual. *See, e.g., Mezzacapo*, 2021 WL 1940435, at *6; *Desai v. Sec'y of Health & Human Servs.*, No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Human Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Human Servs.*, No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018). Thus, although such records are unquestionably the first-generated documents bearing on issues pertaining to situs, they are not per se reliable simply *because* they come first – and in fact the nature of their creation provides some basis for not accepting them at face value.

8

Here too, there is a computerized medical record with several required fields, which appeared to have drop-down menus with potential answers to select from. Ex. 2 at 10 ("Dose (mL):… Site:… Route…"). The notation of "Site: Right Arm," was signed only by the administering medical assistant, and there is no evidence that any supervisor (or Petitioner herself) ever agreed to the record's accuracy. To the contrary, in the first post-vaccination encounter, the PCP accepted Petitioner's history of left-sided pain which she attributed to her vaccination. Ex. 2 at 4. Other records reflect the same history. *See e.g.*, Ex. 7 at 26 (neurology initial consult – "10/2020 received flu vaccine in left deltoid"). Although such histories are fairly attenuated from the actual vaccination, they are still trustworthy evidence, as part of medical encounters for the purpose of diagnosing and treating the alleged vaccine injury. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)

Petitioner's situs allegation is also consistent with the records of at least two previous left-sided vaccines she received. Ex. 2 at 15; Ex. 6 at 174. It is logically explained by her preference to "get all of [her] vaccines in her left arm", Ex. 1 at ¶ 3, and her right-sided dominance. Ex. 6 at 260; Ex. 3 at 10; Ex. 17 at 70. Accordingly, there is preponderant evidence of a left-sided vaccination.

## C. Onset

Petitioner has also preponderantly established new left shoulder pain within 48 hours post-vaccination. 42 C.F.R. §§ 100.3(a), (c)(10)(ii). First, she is not required to medically document such an injury with "objective findings from a physician" (Response at 11) coming within that initial time period. The later medical record histories are entitled to some weight – and they consistently relate back to the vaccination. *See e.g.*, Ex. 2 at 4 (describing pain "after" the flu vaccine); Ex. 7 at 26 (describing symptoms "immediately afterwards" and "the next day").

Additionally, Petitioner has explained that she initially attempted to self-manage her shoulder injury with conservative measures while waiting for her pre-scheduled April 2023 primary care appointment. Ex. 1 at ¶ 6; Ex. 20 at ¶¶ 4, 6.

Petitioner also recalls that because of her shoulder injury, she was in significant discomfort at a wedding on October 24, 2020 (two weeks after the vaccination). Ex. 1 at ¶ 6. The mother of the bride remembers that Petitioner's shoulder injury began "soon before" the wedding. Ex. 15 at ¶ 3. Another family member attests that Petitioner has been a "different person since October 2020," rarely leaving the house because of her shoulder pain and missing many family celebrations since that time. Ex. 16 at ¶ 4. Petitioner's son recalls that since her injury began in October 2020, he has taken over many household maintenance tasks, and he has needed to drive her to destinations more

than 20 miles away. Ex. 14 at ¶ 2. Petitioner's neighbor recalls first learning about the shoulder injury in or around November 2020, and attests to Petitioner's difficulty maintaining her house and yard. Ex. 13 at ¶¶ 3-5. These later statements do not contradict, but supplement, the medical records regarding the likely onset of Petitioner's shoulder injury and her life in the ensuing months before she actually sought medical care (although the treatment delay is still relevant to the *damages* assessment). Overall, Petitioner has met this requirement for a Table SIRVA.[10]

### D. Pain and Reduced Range of Motion Limited to the Shoulder

I have previously explained that under 42 C.F.R. § 100.3(c)(10)(iii), "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there." *Cross v. Sec'y of Health & Human Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) (emphasis in original); *see also K.P. v. Sec'y of Health & Human Servs*., No. 19-0065V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022). Determining whether the pain is predominant to the shoulder, or reflects a more systemic injury, is part of the balancing of evidence performed by special masters – and hence the fact that a claimant reports some radiating pain does not completely invalidate a Table SIRVA.

Here, Petitioner reported that her pain "previously… radiat[ed] to her left forearm and hand" (Ex. 7 at 26), and at some point she had been unable to use her left arm and left fingers (Ex. 3 at 10). But any non-shoulder *pain* was most likely limited in time to *before* her first medical evaluations (starting at the six-month mark) and it was never formally corroborated, diagnosed, or treated. The medical records better support that Petitioner had 1) persistent pain and associated ROM limitations in her left shoulder, and 2) separate sensory symptoms in her left hand and fingers. *See e.g.*, Ex. 7 at 26 (reporting left hand weakness); Ex. 7 at 18 (left hand decreased fine motor strength); Ex. 10 at 7, 10 (left hand numbness and tingling); Ex. 17 at 70 (left hand numbness and tingling). The latter symptoms were diagnosed as cubital tunnel syndrome, but they did not receive any treatment over four years post-vaccination (*see* Ex. 17 at 73). In summary, there is not preponderant evidence of non-shoulder pain that would defeat Petitioner's showing under

---

[10] As part of the onset analysis, I recognize that Petitioner described slipping on ice and falling onto her left side in December 2020, Ex. 1 at 6, while the more contemporaneous medical records suggest this "slip and fall" occurred in February 2021, Ex. 2 at 4; Ex. 7 at 26. But either timeframe for the accident would be well *after* Petitioner and her supporting witnesses' memories of when the shoulder pain began. Therefore, this discrepancy does not meaningfully detract from Petitioner's onset showing.

QAI 3, and any non-shoulder symptoms were more incidental and can be excluded from a SIRVA damages award.

### E.  Other Potential Explanations

Admittedly, Petitioner tended to report that her neurological symptoms began around the same time as the shoulder pain – potentially conflating the two as being part of the same post-vaccination injury. But the only *documented and diagnosed* neurological condition in this case was cubital tunnel syndrome, which is described as a "compressive neuropathy *around the elbow*." Ex. 17 at 73 (emphasis added). Accordingly, there is not adequate evidence of a neurological condition that would explain Petitioner's *shoulder* symptoms under QAI 4. *Accord* Rule 4(c) Report at 8 and Response at 14 (not identifying any such condition). This injury is not germane to a SIRVA (and would not be compensable as a SIRVA sequela).

Respondent also argues there is "strong support" that Petitioner's post-vaccination slip and fall onto her left side caused, or at least contributed, to her left shoulder injury. Rule 4(c) at 8; *see also* Response at 13-14. But as noted above, I have concluded that the shoulder paint began within 48 hours post-vaccination – before this accident. The vaccine injury may have "improved" to some degree over time, but there is not preponderant evidence of a full *resolution* prior to the fall in or around February 2021. Ex 2 at 4 (providing that the post-vaccination shoulder injury "took several weeks to gradually improve"); *see also id.* at 3 (describing the shoulder injury as "chronic" as of May 2021); Ex. 7 at 26 (providing that the pain had "continue[d]," while "also" noting the more recent fall); Ex. 3 at 10 (PT initial evaluation only mentioning the vaccination, not the fall); *accord* Ex. 1 at ¶ 6 (Petitioner later explaining that she intentionally fell onto her left side because her left shoulder/arm could not support a fall face-down).

Neither is there evidence that the fall caused any particularly severe new injury. Petitioner did not seek care immediately afterwards, instead waiting at least a month for her primary care appointment. Entitlement Brief at 21. X-rays did not reveal any fracture or other trauma to the shoulder. Entitlement Brief at 21, citing Ex. 2 at 44-45 (April 2021 x-rays negative for fracture). Treating physicians noted the fall, but instead attributed the shoulder injury to the vaccination. Entitlement Brief at 21- 22, citing e.g., Ex. 7 at 26.

Finally, Respondent emphasizes the April 2021 x-ray findings of left shoulder osteoarthritis and left glenohumeral joint degenerative changes. Rule 4(c) Report at 8 (citing Ex. 2 at 44-45). He contends that "Petitioner's ongoing complaints of pulling, choking, sharp, sore, and radiating pain are all consistent with osteoarthritis." Rule 4(c) Report at 8; *see also* Response at 14 (maintaining that these are "well within the range of symptoms associated with osteoarthritis"). However, no treating physician assessed or

recommended treatment for osteoarthritis, instead viewing this to be a case of deltoid tendinitis. *See e.g.*, Ex. 7 at 27; Ex. 3 at 13. The April 2021 x-ray report provides that any osteoarthritis and degenerative changes were "mild," Ex. 2 at 44, and in October 2024, repeat x-rays of the left shoulder did not visualize any such findings: the "glenohumeral and AC joints appear[ed] normal" and there was "no evidence of… significant degenerative change." Ex. 17 at 8. Respondent has not acknowledged this apparent discrepancy in the imaging, and from my experience such pathology, especially if it is clinically significant, does not disappear or self-resolve. For all of the foregoing reasons, Petitioner has established 42 C.F.R. § 100.3(c)(10)(iv).

### F.  Remaining Table SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed, and I also find that they have been preponderantly satisfied. The record does not suggest that Petitioner had a history of left shoulder pain or any other relevant condition, and her range of motion decreased after the vaccination.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 2 at 11. She experienced residual effects of the injury for more than six months. *See, e.g.*, Ex. 2 at 4-8; Ex. 7 at 26-27; Ex. 1 at ¶¶ 6, 14. And she states that she has not received any type of award, judgment, or settlement for this alleged injury. Ex. 1 at ¶ 15. Thus, Petitioner is entitled to Vaccine Program compensation.

## IV.    Appropriate Compensation for Petitioner's Pain and Suffering

### A.    Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[11]

### B.    Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

When performing the analysis in this case, I review the record as a whole, including the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The evidence establishes that the October 2020 vaccination was followed within 48 hours by new shoulder pain, and subsequently reduced ROM. These symptoms persisted over time, hindering Petitioner's life (including her ability to attend and enjoy family celebrations; visit her sister in hospice care; and care for herself, her dog, and her home). The initial treatment delay of six months did not prevent Petitioner from establishing onset consistent with a Table SIRVA, but the delay also suggests that the injury was less severe. Even if Petitioner hoped that the injury would self-resolve, opting to wait until her prescheduled annual primary care appointment to address it, there is no evidence of Petitioner attempting more urgent or emergency care, or evaluation by any outpatient specialist (e.g., neurology and orthopedics, which did occur later in time).

Later medical records highlight why the treatment delay undercuts overall severity. *See e.g.*, Ex. 2 at 4 (Apr. 13, 2021, PCP providing that the initial shoulder injury "gradually improve[d]" before the February 2021 fall onto ice); Ex. 7 at 26 (Sept. 2, 2021, neurologist providing that the left shoulder's ROM "ha[d] slowly improved" before any formal treatment). The fall onto ice at approximately four months post-vaccination is also relevant, since it may well have exacerbated the SIRVA. *Accord Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047, at *15 and n. 18 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (reasoning that a "sledding incident in February 2019 likely contributed and added to Petitioner's pre-existing shoulder pain and symptoms related to her existing SIRVA," and was therefore relevant to damages).

---

[11] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The medical records starting at the six-month mark establish a *somewhat* moderate injury. Petitioner was not offered a steroid injection or any prescription pain medications – which undercuts her reported pain rating of up to 8/10 at the initial PT evaluation roughly 11 months post-vaccination, on September 20, 2021. Ex. 3 at 11. The PT records also document reduced ROM, followed by improvement over 18 sessions culminating in discharge to a home exercise program on November 18, 2021 (14 months post-vaccination).

The PT discharge was followed by neurology follow-up appointments roughly every six months, with trials of two prescription NSAIDs (Voltaren and celecoxib), then a treatment gap of over one year. Finally in September 2024, an orthopedics initial evaluation reflects Petitioner's history of shoulder injury ever since her October 2020 vaccination, and that day's administration of a steroid injection – *but also* a current pain rating of just 2/10, and exam findings of impingement but *normal* ROM and strength on all measures. These subsequent records (and the later statements from Petitioner and her other witnesses) support that her shoulder injury and its residual effects have persisted to some degree for four years – but it was also less severe than in the (moderate) initial phase.

Turning to the parties' respective positions, Petitioner argues that her past pain and suffering warrants an award of $85,000.00. Damages Brief at 5-8.[12] But Petitioner's cited cases are not entirely comparable, because they almost all featured earlier medical evaluation,[13] which in many cases resulted in earlier treatment and substantial improvement.[14] It is also notable that all of Petitioner's cited opinions featured live witness testimony and were issued over five years ago. But SPU has since issued over two

---

[12] Citing *Dirksen v. Sec'y of Health & Hum. Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for past pain and suffering); *Schandel v. Sec'y of Health & Hum. Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) ($85,000.00); *Kent v. Sec'y of Health & Hum. Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) ($75,000.00); *Marino v. Sec'y of Health & Hum. Servs.*, No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) ($75,000.00); *Goring v. Sec'y of Health & Hum. Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) ($75,000.00); *Knauss v. Sec'y of Health & Hum. Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) ($60,000.00).

[13] *Schandel*, 2019 WL 5260368 at *3 (first medical encounter at two weeks post-vaccination); *Goring*, 2019 WL 6049009 at *9 (two months); *Knauss*, 2018 WL 3432906 at *7 (almost three months); *Kent*, 2019 WL 5579493 at *12 (almost three months); *Dirksen*, 2018 WL 6293201 at *9 (three months); *see also* Response at 20 (noting that a treatment delay is relevant to assessing the injury's severity, and therefore the claim's value).

[14] *See e.g.*, *Schandel*, 2019 WL 5260368 at *12 (39 PT sessions early on, with substantial improvement by the nine month mark); *Goring*, 2019 WL 6049009 at *10 (PT beginning four months post-vaccination, resulting in the pain "mostly resolv[ing]" and substantial improvement within six months); *Knauss*, 2018 WL 3432906 at *3 (14 PT sessions early on, followed by 94% improvement within five months).

hundred reasoned opinions on SIRVA pain and suffering, and these more recent determinations (which have attempted to harmonize their findings with comparable Program matters) suggest that Ms. Davis suffered a comparatively less severe injury than many other petitioners. Thus, Petitioner's pain and suffering request is somewhat high.

Respondent's proffer of $30,000.00[15] is not wholly supported either, however. It would have been helpful for *Petitioner* to address the cited cases in his Reply – but even without such argument, I find them to be distinguishable. First, while the *Pistulka* award recognized that the SIRVA was documented within two weeks, its treatment was limited to just two PT sessions at two months post-vaccination. *Pistulka*, 2025 WL 2115479 at *9.  Subsequent chiropractic records helped to document some residual symptoms, but did not actually treat the shoulder. *Id.* at n. 10. *Turnquest* also featured a more limited treatment course consisting of just three orthopedic evaluations, one x-ray, and one MRI. *Turnquest*, 2024 WL 3665961 at *6. *Hiatt* involved 8 PT sessions followed by one steroid injection about 8 months post-vaccination, with no allegation of ongoing limitations, and neither party offering *any* citations to arguably comparable cases – making it more difficult to assess the appropriate damages. *Hiatt*, 2025 WL 1542314 at *9-10.

Finally, it is unclear whether Respondent followed the instruction to "assume that Petitioner [had] prevail[ed]" in establishing entitlement for a Table SIRVA, upon briefing the appropriate award for such an injury at its full value.[16] Respondent contends that two of Petitioner's cited cases are "not comparable to the instant case because, unlike in this case, entitlement to compensation had already been decided." Response at 19. Thus, Respondent may have undervalued what would constitute a fair damages award if Petitioner prevailed (as she now has).

Overall the parties' briefing was helpful in demonstrating that an appropriate damages award is somewhere between their positions. Based on my overall experience and review of this specific case, I will award $55,000.00 for past pain and suffering.

### Conclusion

For the foregoing reasons, **I conclude that Petitioner is entitled to compensation for a Table SIRVA.**

---

[15] Citing *Pistulka v. Sec'y of Health & Hum. Servs.*, No. 21-1429V, 2025 WL 2115479 (Fed. Cl. Spec. Mstr. June 27, 2025) (awarding $30,000.00 for past pain and suffering); *Turnquest v. Sec'y of Health & Hum. Servs.*, No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024) ($30,000.00); *Hiatt v. Sec'y of Health & Hum. Servs.*, No. 23-1560V, 2025 WL 1542314 (Fed. Cl. Spec. Mstr. May 13, 2025) ($25,000.00).

[16] Scheduling Order entered Apr. 17, 2025 (ECF No. 38) at 1.

**I also award Petitioner a lump sum payment of $56,578.79 (representing $55,000.00 for past pain and suffering,[17] and $1,578.79 for past unreimbursable expenses[18]) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[19]

**IT IS SO ORDERED.**                                    **s/Brian H. Corcoran**
                                                          **Brian H. Corcoran**
                                                          **Chief Special Master**

---

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[18] The parties have stipulated to the expenses. Damages Brief at 9; Response at 23.

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.